# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DARRYL LEE CHERRY, )
         Plaintiff )
)     C.A. 04-292 Erie
v. )     District Judge McLaughlin
)     Magistrate Judge Baxter
UNITED STATES OF AMERICA, et al., )
         Defendants. )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is respectfully recommended that Defendants' motion to dismiss or, in the alternative, motion for summary judgment [Document # 21], be granted.

### II.    REPORT

On October 4, 2004, Plaintiff Darryl Lee Cherry, an prisoner incarcerated at the Federal Correctional Institution at McKean, Pennsylvania ("FCI-McKean"), originally filed this civil rights action pursuant to Bivens v. Six Unnamed Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971) against individual Defendants Dennis Olson, M.D., Clinical Director at FCI-McKean ("Olson"); Herbert Beam, M.D., Staff Physician at FCI-McKean ("Beam"); Rodney Smith, Health Services Administrator at FCI-McKean ("Smith"); James Sherman, Warden at FCI-McKean ("Sherman"); D. Scott Dodrill, Northeast Regional Director of the Federal Bureau of Prisons ("Dodrill"); Harrell Watts, National Inmate Appeals Administrator ("Watts"); and Newton Kendig, BOP Medical Director ("Kendig"). (Document # 3, Complaint). Before service of the original Complaint, Plaintiff filed an Amended Complaint adding the United States of America ("United States") as a Defendant, and adding a claim against all Defendants pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2670, et seq. ("FTCA"). (Document # 6, Amended Complaint).

Plaintiff alleges that the individual Defendants "deliberately and sadistically adopted systematic policies, procedures, and protocols for refusing to treat Plaintiff for his Hepatitis C Virus (HCV) disease by exhibiting deliberate indifference to Plaintiff's serious medical needs" in violation of his rights under the eighth amendment to the United States Constitution. (Document # 3, Complaint at p. 1). In addition, Plaintiff alleges that all Defendants "negligently refused to treat Plaintiff's serious medical ailments" in violation of the FTCA. (Document # 6, Amended Complaint, at p. 1). In particular, Plaintiff claims that the Defendants failed to treat him with Interferon and Ribavirin, and refused to perform a liver biopsy to determine the extent of his liver damage. (Document # 6, Amended Complaint, at p. 3). As a result of these claims, Plaintiff seeks monetary damages.

Defendants have filed a motion to dismiss, or in the alternative, motion for summary judgment [Document # 21], asserting that: (i) Plaintiff's FTCA claim is procedurally defective because he failed to timely and properly exhaust his administrative remedies, and in any event, fails to state a claim against the individual Defendants; (ii) Plaintiff's claim of "deliberate indifference" to his medical needs does not rise to the level of a constitutional violation; (iii) Defendants are entitled to qualified immunity; and (iv) this Court lacks personal jurisdiction over Defendants Watts and Kendig. Plaintiff has filed a response to Defendants' motion essentially restating his allegations. [Document # 25]. This matter is now ripe for consideration.

### A.    Factual History

On June 30, 2000, Plaintiff was designated to FCI-McKean to serve a 121 month term of imprisonment, to be followed by a five year term of supervised release, for Possession with Intent to Distribute Cocaine. (Document # 21, Exhibit 1a, at p. 3). Assuming Plaintiff receives all Good Conduct Time available, his projected release date is June 20, 2008. (Id. at p. 4).

Upon his arrival at FCI-McKean, Plaintiff underwent a medical intake screening, during which Plaintiff reported that he had not taken drugs for 15 years, but had a prior 15-year history of intravenous drug abuse. Plaintiff also reported a history of venous insufficiency with recurrent leg ulcers, for which he wore elastic hose. (See Declaration of Dennis Olson, M.D.,

2

attached to Document # 21 as Exhibit 2 ("Olson Declaration"), at ¶ 3a).[1]

On July 20, 2000, Plaintiff underwent a Hepatitis B and C profile and a liver profile. The results were received on July 26, 2000, indicating that Plaintiff tested positive for the Hepatitis C virus ("HCV"). (Olson Declaration at ¶ 3g). On August 3, 2000, Plaintiff was seen in the General Medical Chronic Care Clinic ("Chronic Care Clinic") for HCV, and was educated regarding HCV's complications, progression and prognosis, as well as his diet, weight loss, smoking, exercise, and medication. (Olson Declaration at ¶ 3m). Plaintiff was seen again in the Chronic Care Clinic on November 2, 2000, at which time he was in no acute distress and was educated regarding the nature of HCV, its complications and treatment alternatives. (Olson Declaration at ¶ 3v).

Plaintiff next reported to the Chronic Care Clinic on February 1, 2001, at which time "he displayed no symptomatology of Hepatitis C." (Olson Declaration at ¶ 3aa). On February 15, 2001, a liver profile was conducted, the results of which revealed Plaintiff had a normal ALT level of 35, based upon a normal reference range of 8-40.[2] (Olson Declaration at ¶ 3bb). Plaintiff was seen again in the Chronic Care Clinic on May 3, 2001, at which time he had no complaints of abdominal pain or jaundice and he was engaging in limited activity. (Olson Declaration at ¶ 3ff). Plaintiff returned to the Chronic Care Clinic on August 2, 2001, complaining of leg pain, but denying abdominal and lower back pain. He was assessed with HCV and told to return for a follow-up visit in three months. (Olson Declaration at ¶ 3pp).

---

[1] In his Declaration, Dr. Olson provides a lengthy summary of all medical treatment Plaintiff received at FCI-McKean from June 30, 2000 through June 17, 2005. In addition to treatment for Hepatitis C, Plaintiff's medical records indicate that he was treated for such ailments as peripheral venous insufficiency/peripheral vascular disease and attendant ulcers and edemas (Olson Declaration at ¶ 3z and 3yy); lumbosacral sprain (Id. at ¶ 3jj); rash and itchy skin (Id. at ¶ 3hhh); toenail fungus (Id. at ¶ 3qqq); bald spots on plaintiff's scalp and beard (Id. at ¶ 3llll); cellulitis (Id. at ¶ 3mmmmm); warts (Id. at ¶ 3xxxxxx); and bronchitis (Id. at ¶ 3qqqqqqq). In the interest of brevity, this Court will only recount Plaintiff's medical treatment history to the extent it relates to his Hepatitis C condition.

[2] ALT is a liver enzyme that is tested to determine if a patient has liver damage. (See NIH Consensus Development Program, Management of Hepatitis C: 2002, National Institutes of Health Consensus Conference Statement, June 10-12, 2002, attached as Exhibit 1e to Document # 21, Defendants' Brief, at p. 4).

3

On August 14, 2001, a lipid test and a liver test were conducted, which revealed Plaintiff's ALT level was 47, within the normal reference range of 11-66. (Olson Declaration at ¶ 3qq). Plaintiff returned to the Chronic Care Clinic on November 1, 2001, at which time he denied abdominal pain and jaundice, and was in no acute distress. (Olson Declaration at ¶ 3bbb). On February 4, 2002, reported to the Chronic Care Clinic for a follow-up visit, again denying abdominal pain and jaundice. (Olson Declaration at ¶ 3iii). A liver test conducted on February 25, 2002, revealed that Plaintiff's ALT level was 61, within the normal reference range of 11-66. (Olson Declaration at ¶ 3kkk).

On May 6, 2002, Plaintiff reported to the Chronic Care Clinic, complaining that he felt "swollen." Plaintiff denied abdominal pain and "appeared well." His physical examination was unremarkable and "[t]here was no evidence the Hepatitis C had progressed or was causing complications." (Olson Declaration at ¶ 3lll). On May 20, 2002, a liver test was conducted, which elicited an ALT level of 53, within the normal reference range of 11-66. (Olson Declaration at ¶ 3mmm). Another liver test was conducted on August 9, 2002, which also revealed that Plaintiff's ALT level was within the normal reference range of 11-66. (Olson Declaration at ¶ 3rrr).

In December 6, 2002, Plaintiff was admitted to the Federal Detention Center at Milan, Michigan ("FDC-Milan") as a holdover inmate. (Olson Declaration at ¶ 3uuu). During December 2002, Plaintiff was referred to FDC-Milan's Chronic Care Clinic for treatment of hypertension and leg ulcers secondary to peripheral vascular disease ("PVD"). (Olson Declaration at ¶¶ 3uuu-3www). On March 19, 2003, Plaintiff underwent a complete metabolic reading and blood count, which revealed an elevated ALT level of 96, based on a normal reference range of 8-40. (Olson Declaration at ¶ 3xxx). He was subsequently transferred to the Federal Transport Center at Oklahoma City, Oklahoma ("FTC-Oklahoma City") on March 26, 2003, where he was prescribed Pentoxifylline,[3] Hydrochlorothiazide ("HTCZ"),[4] and aspirin.

---

[3]

According to Dr. Olson, Pentoxifylline is "a medication used to improve blood flow by decreasing the viscosity of blood." (Olson Declaration at ¶ 3t). Based on this description, it is apparent that the medication was used to treat

4

(Olson Declaration at ¶ 3yyy).

On May 2, 2003, Plaintiff was transferred back to FCI-McKean, where his medications were continued and he was placed on the General Medicine II Clinic for his HCV. (Olson Declaration at ¶ 3dddd). A liver profile was conducted on May 29, 2003, which revealed a normal ALT level of 53, based on a reference range of 11-66. (Olson Declaration at ¶ 3gggg). Another liver profile was conducted on August 25, 2003, which revealed a slightly elevated ALT level of 67, based on a normal reference range of 11-66. (Olson Declaration at ¶ 3mmmm).

On October 6, 2003, Plaintiff gave blood samples for a comprehensive metabolic count, an alphafetoprotein count, and a complete blood count. These tests elicited results indicating a slightly elevated ALT level of 68, based upon a normal reference range of 11-66. (Olson Declaration at ¶ 3oooo). On October 8, 2003, an administrative notation was entered in Plaintiff's medical record indicating that the laboratory results revealed "slightly elevated liver function including increased MCV (mean cell volume, the average volume of a red blood cell), Lymphocytes, monocytes, and macrocytes." As a result, an HIV test was recommended. (Olson Declaration at ¶ 3pppp).

On October 13, 2003, and October 16, 2003, Plaintiff submitted written requests to Defendant Beam complaining that he was not being treated properly for his HCV and requesting a liver biopsy. Dr. Beam responded to each request by advising Plaintiff that they would discuss Plaintiff's concerns the next time Plaintiff reported to the Chronic Care Clinic. (Olson Declaration at ¶¶ 3qqqq and 3rrrr). In a separate written request dated October 16, 2003, Plaintiff also asked Defendant Beam to give him a Hepatitis A vaccination. In response, Defendant Beam advised Plaintiff that he would check Plaintiff's blood tests for evidence of the

---

Plaintiff's peripheral vascular disease. Plaintiff's medical records indicate that he was first prescribed this medication at FCI-McKean on September 19, 2000.

4

According to Dr. Olson, hydrochlorothiazide is "a diuretic used to treat high blood pressure." (Olson Declaration at ¶ 3dd). Plaintiff's medical records indicate that this medication was first prescribed for Plaintiff at FCI-McKean on March 8, 2001.

5

Hepatitis A virus to see if he needed a vaccine, and that he would discuss Plaintiff's concerns with him during Plaintiff's next visit to the Chronic Care Clinic. (Olson Declaration at ¶ 3ssss).

On November 4, 2003, Plaintiff was seen in the Chronic Care Clinic for HCV and PVD. He complained of pain in his right side, had headaches, and "was quite focused on getting the Hepatitis A vaccine." He was assessed with HCV and his medications were continued. In addition, he was given a Hepatitis A antibody test. (Olson Declaration at ¶ 3uuuu). On November 11, 2003, Plaintiff reported to sick call complaining of burning pain in his right leg and right flank, which he described as "like fire on the inside" for four days. Plaintiff indicated his belief that the burning sensation was caused by HCV. On examination, Plaintiff was in no apparent distress, and no lesions or erythema were visible on his right flank. He was assessed with alopecia (hair loss) and flank pain and was told to follow up as needed. (Olson Declaration at ¶ 3vvvv). The results of the Hepatitis A antibody test were returned to FCI-McKean on November 14, 2003, indicating that Plaintiff tested negative for the Hepatitis A virus. (Olson Declaration at ¶ 3wwww).

Plaintiff was seen in the Chronic Care Clinic on February 4, 2004, at which time he reported that he felt well and was in no pain. His medications were continued and he was given the Hepatitis A and B vaccines. (Olson Declaration at ¶ 3yyyy). Plaintiff returned to the Chronic Care Clinic on May 5, 2004, complaining of lateral pain in his lower left leg. After examination, he was assessed with HCV and PVD and his medications were continued. (Olson Declaration at ¶ 3jjjjj). On May 20, 2004, the results of a liver profile revealed that Plaintiff had an ALT level of 51, within the normal reference range of 11-66. (Olson Declaration at ¶ 3lllll).

Plaintiff's next visit to the Chronic Care Clinic occurred on August 3, 2004, at which time his HCV diagnosis was noted, but his primary complaint was pain from leg ulcers stemming from his PVD. (Olson Declaration at ¶ 3aaaaaa). On August 10, 2004, a liver profile was conducted, which revealed that Plaintiff's ALT level was 55, within the normal reference range of 11-66. (Olson Declaration at ¶ 3cccccc). On August 25, 2004, Plaintiff received a Hepatitis A and B vaccination. (Olson Declaration at ¶ 3ffffff). During September and October 2004, Plaintiff was treated multiple times for leg ulcers related to his PVD, but no complaints

were noted regarding his HCV. (Olson Declaration at ¶¶ 3gggggg-3nnnnnn).

Plaintiff was next seen in the Chronic Care Clinic on October 28, 2004, at which time he complained of pain in his hip, neck and back side from sleeping. He was assessed with HCV, PVD and edema and his medications were continued. (Olson Declaration at ¶ 3oooooo). From November 2004 through January 2005, Plaintiff was again treated multiple times for leg ulcers related to his PVD, without any complaints regarding his HCV. (Olson Declaration at ¶¶ 3pppppp-3zzzzzz).

On January 26, 2005, a liver profile was conducted, which revealed that Plaintiff's ALT level was 51, within the normal reference range of 11-66. (Olson Declaration at ¶ 3aaaaaaa). Plaintiff returned to the Chronic Care Clinic on February 22, 2005, at which time his only complaints related to "venous stasis and left ankle skin breakdown." He was assessed with HCV, PVD, and venous stasis and his medications were continued. (Olson Declaration at ¶ 3ggggggg).

On April 1, 2005, an HCV genotyping test was conducted, which indicated that Plaintiff had type 1b Hepatitis C.[5] (Olson Declaration at ¶ 3jjjjjjj). On the same date, a hepatic function Panel, BUN Creatinine, and serum tests were conducted, which elicited results within normal limits, except for Plaintiff's ALT level, which was elevated at 59, based upon a normal reference range of 0-40. (Olson Declaration at ¶ 3kkkkkkk).

On May 10, 2005, Plaintiff was seen in the Chronic Care Clinic complaining of "terrible" pain from ulcers on his ankles secondary to his PVD. No complaints or symptoms were noted with regard to his HCV. (Olson Declaration at ¶ 3qqqqqqq). The remaining medical records submitted in this case, which run through June 17, 2005, relate solely to treatment of Plaintiff's leg ulcers secondary to PVD. (Olson Declaration at ¶¶ 3rrrrrrr-3vvvvvvv).

---

[5] Types "1a and 1b are the most predominant hepatitis C virus genotypes in the United States and patients infected with these viral genotypes generally have more severe liver disease and lower rates of response to interferon therapy than patients infected with genotypes 2a or 2b." N.N. Zein, J. Rakela, E.L. Krawitt, K.R. Reddy, T. Tominaga, D.H. Persing, and the Collaborative Study Group, *Hepatitis C Virus Genotype in the United States; Epidemiology, Pathogenicity, and Response to Interferon Therapy*, ANNALS OF INTERNAL MEDICINE, 125:634-639 (1996), http://www.hepnet.com/hepc/wormangeno.html.

7

**B.     Standard of Review**

    **1.     Motion to Dismiss**

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) must be viewed in the light most favorable to the plaintiff and all the well-pleaded allegations of the complaint must be accepted as true. Neitzke v. Williams, 490 U.S. 319 (1989); Langford v. City of Atlantic City, 235 F.3d 845, 847 (3d Cir. 2000). The motion cannot be granted unless the court is satisfied "that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984). See also Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

Rule 8(a) of the Federal Rules of Civil Procedure states that a pleading must set forth a claim for relief which contains a short and plain statement of the claim showing that the pleader is entitled to relief. The issue is not whether the plaintiff will prevail at the end but whether he should be entitled to offer evidence in support of his claim. Neitzke v. Williams, 490 U.S. 319 (1989); Scheuer v. Rhodes, 419 U.S. 232 (1974). However, a court need not credit a complaint's "bald assertions" or "legal conclusions" when deciding a motion to dismiss. Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997) citing In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1429-30 (3d Cir.1997). Therefore, in order to survive a motion to dismiss for failure to state a claim, the complaint must only set forth sufficient information to suggest that there is some recognized legal theory upon which relief can be granted. See Swierkiewicz.

    **2.     Summary Judgment**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by

8

affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the

dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### 3.     *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Haines v. Kerner, 404 U.S. 519, 520-521(1972), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should be done so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same).

### C.     Subject Matter Jurisdiction and the Federal Tort Claims Act

The Federal Tort Claims Act (FTCA) grants jurisdiction to the federal courts to hear suits against the United States Government for torts committed by its employees while in the scope of their employment. See 28 U.S.C. § 2675(a). The FTCA allows federal inmates to sue the United States for injuries sustained while incarcerated. 28 U.S.C. § 2674. The FTCA specifically requires an initial presentation of the claim to the appropriate federal agency and a final denial by the agency as a non-waivable prerequisite to the filing of the lawsuit. See

Deutsch v. United States, 67 F.3d 1080, 1091 (3d Cir. 1995). This requirement is set forth in 28 U.S.C. § 2675(a)[6]:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office of employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

The FTCA specifically requires an initial presentation of the claim to the appropriate federal agency and a final denial by the agency as a non-waivable prerequisite to the filing of the lawsuit. Id; See also Williams v. United States, 1995 WL 769497 (E.D.Pa. 1995), citing Bradley v. United States, 856 F.2d 575 (3d Cir. 1988), vacated on other grounds, 490 U.S. 1002 (1989). This requirement is jurisdictional and cannot be waived. Barren by Barren v. United States, 839 F.2d 987, 992 (3d Cir. 1988). See also McNeil v. United States, 508 U.S. 106 (1993)(FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies); Livera v. First Nat. State Bank, 879 F.2d 1186, 1194 (3d Cir. 1989)(Exhaustion of administrative remedies is a jurisdictional requirement that cannot be waived and must be strictly construed).

Defendants argue that Plaintiff has not complied with the FTCA's exhaustion requirement. Defendants have provided the affidavit of Joyce Horikawa, Bureau of Prisons Senior Attorney Advisor, who testifies that Plaintiff filed an administrative tort claim regarding the issues raised in this action on September 28, 2004, just days before filing the present lawsuit

---

[6] Prior to 1996, FTCA claimants had the option of filing suit in federal court without first presenting their claims to the appropriate federal agency. Because the vast majority of these claims were ultimately settled before trial, however, the Department of Justice proposed that Congress amend the FTCA to "requir[e] all claims to be presented to the appropriate agency for consideration and possible settlement before a court action could be instituted. This procedure would make it possible for the claim first to be considered by the agency whose employee's activity allegedly caused the damage.... Since it is the one directly concerned, it can be expected that claims which are found to be meritorious can be settled more quickly without the need for filing suit and possible expensive and time-consuming litigation." S.Rep. No. 1327, 89th Cong., 2d Sess., 3 (1966), U.S. Code Cong. & Admin. News 1966, pp. 2515, 2517.

on October 4, 2004. (Document # 21, Exhibit 1c; Declaration of Joyce Horikawa attached to Document # 21 as Exhibit 1 ("Horikawa Declaration"), at ¶ 2c). Plaintiff's tort claim was denied on March 24, 2005, after which Plaintiff filed an amended complaint in this action adding the United States as a Defendant and adding allegations of medical negligence under the FTCA. (See Document # 21, Exhibit 1c at p. 8; Document # 6, Amended Complaint).

The plain language of the statute is clear that the administrative remedy process must be finally decided prior to the commencement of an action in federal court pursuant to the FTCA. See 28 U.S.C. § 2675(a); McNeil v. United States, 508 U.S. 106, 111 (1993) ("the command that an 'action shall not be instituted ... unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally decided by the agency in writing' ... is unambiguous. We are not free to rewrite the statutory text."). See also Sparrow v. United States Postal Service, 825 F.Supp. 252, 255 (9th Cir. 1993)("Because § 2675(a) of the FTCA requires that an administrative claim be finalized at the time the complaint is filed, plaintiff's complaint cannot be cured through amendment, but instead, plaintiff must file a new suit"). Plaintiff filed the instant action before his administrative tort claim was finally decided by the agency. He cannot cure this procedural defect through amendment, but must file a new suit. Thus, Plaintiff's FTCA claim should be dismissed for lack of subject matter jurisdiction.

### D.   Discussion

In the medical context, a constitutional violation under the Eighth Amendment occurs only when prison officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976). "In order to establish a violation of [the] constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

12

Deliberate indifference to a serious medical need[7] involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S at 104. Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury" White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). "[M]ere disagreements over medical judgment" do not rise to the level of an Eighth Amendment violation. White, 897 F.2d at 110. Furthermore, deliberate indifference is generally not found when some level of medical care has been offered to the inmate. Clark v. Doe, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979), quoting Bowring v. Goodwin, 551 F.2d 44, 48 (4th Cir. 1977).

In this case, Plaintiff contends that Defendants' denial of a liver biopsy and Interferon/Ribavirin treatment for his HCV constitutes deliberate indifference to his serious medical needs in violation of the Eighth Amendment.[8] As such, Plaintiff is challenging

---

[7] A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correction Institute Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

[8] Defendants do not dispute that Plaintiff's HCV represents a serious medical need. (Document # 21, Defendants' Brief, at p 13

13

Defendants' medical judgment in not using a particular diagnostic procedure or initiating a particular course of treatment, which generally does not rise to the level of a constitutional violation. White, 987 F.2d at 110. Moreover, Plaintiff's medical records clearly demonstrate that Plaintiff's HCV was closely monitored by FCI-McKean's medical staff in accordance with the Federal Bureau of Prison's ("BOP") established guidelines for treating inmates diagnosed with HCV.[9]

In particular, the BOP's guidelines provide that "[i]nmates with chronic HCV infection should be monitored periodically in chronic care clinics." (Document # 21, Defendants' Motion, Exhibit 1d at p. 41). Plaintiff's medical records reflect that he was diagnosed with HCV on July 26, 2000, after which his condition was closely monitored at the Chronic Care Clinic approximately every three (3) months. (Olson Declaration at ¶¶ 3m, 3v, 3aa, 3ff, 3pp, 3bbb, 3iii, 3lll, 3qqq, 3eeee, 3llll, 3uuuu, 3yyyy, 3jjjjj, 3aaaaaa, 3oooooo, 3ggggggg, and 3qqqqqqq). Furthermore, Plaintiff's medical records reflect that FCI-McKean's medical staff conducted frequent laboratory tests to measure Plaintiff's liver function and to check for indications of liver damage by monitoring Plaintiff's ALT levels. (Olson Declaration at ¶¶ 3g, 3bb, 3qq, 3kkk, 3nnn, 3rrr, 3gggg, 3mmmm, 3oooo, 3llllll, 3cccccc, and 3aaaaaaa). This testing was performed in accordance with the guidelines' recommendation that "[i]nmates with chronic HCV infection should be periodically evaluated and have ALT levels monitored to help determine if liver biopsy is warranted...." (Document # 21, Defendants' Brief, Exhibit 1d at p. 42). Thus, Plaintiff's claim that Defendants have acted deliberately indifferent to his HCV infection is belied by the medical record in this case.

Further evidence belying Plaintiff's claim of deliberate indifference is offered by the following results of the laboratory tests that were conducted by Defendants:

**Normal**

---

[9] The BOP's guidelines for treating Hepatitis C are based upon the National Institutes of Health Consensus Development Conference Statement, "Management of Hepatitis C: 2002." (See Document #21, Defendants' Motion, Exhibits 1d and 1e).

14

| Date of Test | ALT Level | Reference Range |
|---|---|---|
| July 20, 2000 | 42* | 8-40 |
| February 15, 2001 | 35 | 8-40 |
| August 14, 2001 | 47 | 11-66 |
| February 25, 2002 | 51 | 11-66 |
| May 20, 2002 | 53 | 11-66 |
| August 9, 2002 | 56 | 11-66 |
| March 19, 2003 | 96** | 8-40 |
| May 29, 2003 | 53 | 11-66 |
| August 25, 2003 | 67* | 11-66 |
| October 6, 2003 | 68* | 11-66 |
| May 19, 2004 | 51 | 11-66 |
| August 10, 2004 | 55 | 11-66 |
| January 26, 2005 | 51 | 11-66 |
| April 2, 2005 | 59* | 8-40 |

\*   Minimally elevated
\*\*  ALT two times normal or greater

(See Document # 21, Exhibit 2a, part 4 at pp. 1-19, and Exhibit 2a, part 3 at p. 40).

Under the heading "[i]dentifying candidates for liver biopsy," the BOP's guidelines provide that:

> **- Normal ALT:** Approximately 30% of persons with chronic HCV infection have normal ALT levels. Inmates with normal ALT levels should have ALT levels remeasured several times over the next 2 to 12 months. *Inmates with persistently normal ALT levels (at least 3 normal values over a 6 to 12 month period) with no clinical or laboratory evidence of liver disease, are unlikely to have marked liver inflammation or fibrosis.* ...

\*       \*       \*

> **- Minimally elevated ALT:** Approximately 40% of persons with chronic HCV infection have minimally elevated ALT levels (< 2 times upper limit of normal). ...
>
> Inmates with minimally elevated ALT levels should have ALT levels remeasured over 3 to 6 months and should then be reassessed. The decision to obtain a liver biopsy in these inmates should be made on a case-by-case basis. ...

\*       \*       \*

> **- ALT two times normal or greater:** Inmates with ALT levels two times the upper limit of normal or greater should have ALT measurements repeated at least twice over a 6 month period. *Inmates with persistent elevations in ALT levels › twice normal should be referred directly for liver biopsy unless antiviral therapy is contraindicated.* ...

(See, Document # 21, Defendants' Brief, Exhibit 1d at pp. 42-43)(emphasis added).

15

As Plaintiff's test results indicate, 9 of the 14 laboratory tests reported in Plaintiff's medical records revealed normal ALT levels, 4 revealed minimally elevated ALT levels, and only one revealed an ALT level greater than two times the upper limit of normal. In those instances where Plaintiff's ALT levels were minimally elevated, subsequent tests elicited normal results over an extended period of time. Moreover, the test that revealed an ALT level more than two times the normal limit appears to have been an aberration, as Plaintiff's ALT level tested normal only two months later. Viewed as a whole, the test results reveal that Plaintiff's ALT levels have been persistently normal or near normal throughout his period of incarceration at FCI-McKean.

According to BOP's guidelines, "A liver biopsy is usually not warranted if ALT levels are persistently normal." (Document # 21, Defendants' Brief, Exhibit 1d at p. 42). In fact, the only time the guidelines require a liver biopsy is when an inmate has persistent elevations in ALT levels greater than twice the normal limit, which is clearly not the case here. (Document # 21, Defendants' Brief, Exhibit 1d at p. 43). Because a liver biopsy is not warranted in Plaintiff's case, the BOP guidelines also do not recommend Interferon/Ribavirin treatment, as indicated by the following section of the guidelines bearing the heading "[i]ndications for antiviral thereapy based on liver disease:"

> Antiviral therapy [Interferon/Ribavirin treatment] is recommended for patients with chronic hepatitis C **and** a liver biopsy with portal or bridging fibrosis **and** at least moderate inflammation and necrosis.

(Document # 21, Defendants' Brief, Exhibit 1d at p. 44)(emphasis added). It is clear from this language that a liver biopsy and evidence of moderate inflammation and necrosis are prerequisites to antiviral therapy.

Accordingly, Plaintiff's medical records demonstrate that Defendants' denial of a liver biopsy and refusal to initiate Interferon/Ribavirin treatment were consistent with the BOP's treatment guidelines and were based on sound medical judgment. As a result, Plaintiff is unable to demonstrate that Defendants' actions have constituted deliberate indifference to his serious medical needs. Although Plaintiff may disagree with the treatment he has been receiving, a prisoner's disagreement with a course of treatment does not sustain a cognizable constitutional

claim. Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1080 (3d Cir. 1976). See also Iseley v. Dragovich, 90 Fed. Appx. 577, 581 (3d Cir. 2004)(holding that denial of liver biopsy and Interferon/Ribavirin treatment did not constitute deliberate indifference because, in the professional judgment of prison physicians, inmate's condition had not progressed to the point where such treatment would have been appropriate); Christy v. Robinson, 216 F.Supp.2d 398, 416 (D.N.J. 2002)(holding that denial of liver biopsy and Interferon/Ribavirin therapy to treat Hepatitis C did not amount to deliberate indifference because "there is no evidence that the course of treatment adopted by defendants deviated from the standard medical practice"); Free v. Unknown Officers of the Bureau of Prisons, 103 Fed. Appx. 334, 337 (10th Cir. 2004) (holding that inmate's disagreement with prison doctors' denial of interferon/ribavirin therapy for his Hepatitis C "does not give rise to a claim for deliberate indifference to serious medical needs").

## III   CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' motion to dismiss or, in the alternative, motion for summary judgment [Document # 21], should be granted.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

S/Susan Paradise Baxter<br>
SUSAN PARADISE BAXTER<br>
Chief U.S. Magistrate Judge

Dated: February 22, 2006

cc:   The Honorable Sean J. McLaughlin
      United States District Judge
      all parties of record (lw)