## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSLYVANIA

DONALD L. MOSHIER, JR.

      Plaintiff,

vs.

 

UNITED STATES OF AMERICA et al,
John J. LaManna
Dr. Herbert Beam
Dr. Olson
Dr. Smith
James Sherman

      Defendants.

Civil Action No. 05-180 (ERIE)

Magistrate Judge:
Susan Paradise Baxter

# FILED

## DEC 1 4 2007

CLERK U.S. DISTRICT COURT
WE. DIST. OF PENNSYLVA

Submitted By:

DONALD L. MOSHIER, JR.
#10924-052
FCI Schuylkill
P.O. Box 759
Minersville, PA 17954

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSLYVANIA

DONALD L. MOSHIER, JR.
        Plaintiff,

vs.

UNITED STATES OF AMERICA et al,
John J. LaManna
Dr. Herbert Beam
Dr. Olson
Dr. Smith
James Sherman
        Defendants.

Civil Action No. 05-180 (ERIE)

Magistrate Judge:
Susan Paradise Baxter

## PLAINTIFF'S REBUTTAL TO UNITED STATES GOVERNMENTS MOTION FOR SUMMARY JUDGMENT

NOW COMES Donald L. Moshier, Jr. pro se, proceeding in his lawsuit against the United States Government, and five (5) individual defendants, bringing tort and Constitutional claims based on inadequate medical care that he received during his incarceration at the Federal Prison in McKean County, Mckean Pennslyvania (FCI McKean). This claim is against the United States for medical malpractice pursuant to Federal Tort Claims Act (FTCA) 28 USC §§ 1346(b); 2671 et seq. Plaintiff alleges that the medical staff at FCI McKean provided neligent and inadequate medical treatment in regard to his Hepatitis C virus. As a result from the emotional and physical damage sustained from negligent and inadequate care/treatment, Plaintiff seeks $100,000,00 in actual damages, plus costs, and any other relief the Court deems appropriate.

The Government leans heavily on Pennslyvania's Law standards for medical claims such as this claim, regarding expert reports

or testimony, negating material facts presented by Mr. Moshier.

## EXPERT TESTIMONY

Mr. Moshier is recorded to be indigent, with adequate funds required to hire an expert[s] qualified in the medical profession specializing in Hepatitis c patient/claims. However, when Plaintiff was transferred FCI McKean; to USP Lewisberg; to FCI Schuylkill,due the notoriety of his pending medical lawsuit, a significant amount of his medical documents are missing due to staff going through his property before and during his transfer to FCI Schuylkill on or about March 19, 2007.

Plaintiffs only available expert witness' to support his allegations are: Dr, Horsley, Doctor at bradford Regional Medical Center whom performed Plaintiffs liver biopsy on August 24,2004, SEE EXHIBIT. Dr. Graham attending physcian at Bradford Regional Medical Center also. Date of Dr. Grahams treatment was April 18,2005. (Dr. Graham is also recorded as a witness in Mr. Moshiers statement of interrogatories. Mr. Moshier, quote's The Hepatitis C Support Project at - A tides Center Project P.O. Box 427037, CA 94142. Also Prison Health News at- The Aids Library Philadelphia Fight 1233 Locust Street, 5th Floor, Philadelphia, PA 19107. This Court must take under consideration that Claiment is bound by very strict prison rules that he cannot get a Hepatoltgist into the prison to examine him, much less afford to pay a security detail of two prison guards an 8-hour pay to leave the prison, much less to seek permission from the Warden to leave the prison, and present himself to a facility to be examined by a professional.

On October 21, 2003, lab results from Plaintiff's hepatic

function panel indicated Mr. Moshiers ALT level was twice the normal limit. Not until February 12th of 2004, was Plaintiff tested again, and still his ALT level was above normal. Interestingly the government contends that Mr. Moshier failed to show up for a third check-up, on April 21st,2004, when in fact by his own admission Dr. Beam failed to put Mr. Moshier on the call-out list. What was the reason for the delay until May 17th,2004, that the staff allege they received test results and Mr. Moshier was again twice the upper limit. The fact is right before us! The doctor's at FCI McKean didn't follow up on Mr. Moshier until he was forced to file a tort claim. Mr. Moshier was at "wits end" frustrated at his repeated delays and told to be patient. He was in constant pain, and passing blood, fatigued, with major headachs, with impaired vision. Finally, due to controversy over a lawsuit the staff consented to a liver biopsy on July 15,2004. By this time Mr. Moshier's liver was as the doctor's quote:"the consistency of wood". Dr. Beam remarked **"that after Mr. Moshier decided to have treatment"** is false. Mr. Moshier was pleading for treatment since September of 2003. The reason for the delay in the first instance was the expense of the Interferon/Ribavarin medication. Thats the crux of this whole suit is about money. Dr. Beam told Mr. Moshier that he had to get permission from the Hospital Administrator, when he is not even an MD, to be made aware of the seriousness of Mr. Moshier;s condition. It wasn't until September of 2004, the staff finally gave in due the fact that Mr. Moshier had filed the procedure leading to a tort. Only then did they commit to the treatment. Are BOP Guidlines for incarcerated prisoners the same for the people living in the "free" world? Do doctors delay for over a year in the

(3)

outside world? The truth is NO. Individuals committed to prisons are "second class" citizens with all rights of freedom suspended till a future date, condemnd for punishment, absent the comforts of home and personal physicians recognized by the State Medical Board!

The fact of the outcome of this whole suit albiet all the medical jargon is nothing more than a smokescreen to evade compensating an individual for his pain and neglect at the hands of incompetent medical staff that can't find employment in a certified hospital or clinic, so they resort to working in a prison where the standards are lower, and they can veil their ignorance. As based on on information taken from the inter-net, Dr. Beams medical license does not permit him to treat patients in the State of Pennslyvania!

Mr. Moshier never disputed the fact that he may have acquired cirrohsis at some time in his life. He was honest in an interview with Dr. Beam back in 2003. The government insinuates that Mr. Moshier claims they caused his cirrohsis, he's not claiming that at any point. Mr. Moshier's claim is that from the neglect and the delay in treating him, that the staff at FCI McKean allowed his body to become rampant with infection causing him to nearly die from a gangerous gallbladder. Dr. Graham told Mr. Moshier when he received him at ER, "you have a 104° tempeture that his gallbladder was badly infected, if you would have been treated with the proper anti-biotics I wouldn't have to open you up" "you are a very sick man, in another 20 hours, you may have died"

A note of concern should be pursued by this Court. If from the very beginning on September 9, 2003, Dr. beam and staff became

(4)

aware of mr. Moshier's first blood test. BOP Guidelines clearly shown his ALT levels twice normal, why the delay? Plaintiff argues that because of the laxity of the doctor[s] at FCI McKean the Hepatitis C virus continued unabeted until he became very ill. His condition termed at the beginning as a mild case of cirrohsis, permeated through his system infecting his gallbladder until it became gangerous.

Mr. Moshier was taken off Intreferon/Ribavirin treatment in April 14 , of 2005, . when he was admitted to the hospital. Records allege that he was on Interferon/Ribavirin, for less than six months, during this six months, Mr. Moshier never received the proper prescribed doses, according to the medical Guide.

> It states in the medical Guide, the only cure for chronic infection with HCV, is a complicated and lengthy regimen of Interfern injections and Ribavirin capsules, these must be taken for a year or more. Interferon is self-injected several times each week.

On October 28, 2004, a sixteenth of a dose only once a week was prescribed by Dr. Beam, hardly enough to combat the HCV infection.

The government contends that on July 12, 2007, Plaintiff's treatment was initiated on October 28, 2004, by Dr. Beam, and extended to April 14, 2005. Then Mr. Moshier gave himself the injections weekly, less than 180 micrograms. Mr. Moshier disputes this assertion. This was not an accurate statement. During this stated interim when Mr. Moshier went to the pill line for his injection, he was told " they were out of his medication, come back next week", the injections were not continous several times a week as cited in the MED Guidelines. Mr. Moshier is 286 lb. individual. According to the

(5)

FDA Approved Table for Treatment, Mr. Moshier took 200 mg of Ribavirin twice a day till April 14, 2005. However, this daily dose is affected by the individuals weight. The proper dose should have been 1,200 mg. twice a day. This is part of Mr. Moshiers argument, is that the Interferon injection is 180 micrograms., in which he was given less than 1.5 mcg. per week, when it was available to him. Mr. Moshier was not given the recommended dose of Interferon according to the Medical Guidelines as prescribed by the Medical Guidelines.

Dr. Kisloff given the false and misleading information provided by the medical staff at FCI McKean, could only arrive to his professional opinion. In plain lanquage he was not provided with correct and accurate information to formalize his report.

Had Mr. Moshier's combination therpy been given the correct dose and regular intervals as listed in the Medical Guidlines for patients with Hepatitis C infection, as far advanced as Mr. Moshiers, most likely he wouldn't have brought suit. But for the simple reason of expense of the Interferon/Ribavirin, the intensive care, blood tests, and continous monitoring of Mr. Moshier, it was too time consuming for the doctor's, given the staff has 1,250 inmates to provide for, they hurry through their daily log.

According to the Federal Bureau of Prisons Clinical Practice Guidelines for the prevention and treatment of viral Hepatitis C, the governments main concern are Mr. Moshier's ALT levels. They quote that claiments ALT levels was not three (3) times the normal. Therefore they delayed treatment, referring to BOP Guidelines. According to  claiments case as recorded, his ALT levels were <u>twice</u> <u>the normal</u>. Dr. Beam was aware that Mr. Moshier had cirrohsis of

(6)

the liver, by recent tests at Cayuga Medical Center. Since Mr. Moshiers ALT levels were high, Dr. Beam, being an expert familiar and interpreting blood tests for the liver should have known that massive liver injury is associated with rated increases in ALT. This correlation is more prevalent at earlier stages of detected Hepatitis C, before cirrhosis develope. Once cirrhosis occures, ALT levels may not be high, therefore, ALT is no longer a good indicator of further liver damage. Dr. Beam relies and focus' on Mr. Moshiers ALT and AST counts. However, other tests are more important in measuring the health of the liver. Based on Mr. Moshiers exhibit, the expert information Mr. Moshier relies, clearly demonstrates that Dr. Beam and medical staff at FCI McKean including the BOP, was well aware that Mr. Moshier's ALT, and other blood tests proved that he was already in the advanced states of cirrohsis.

Therefore, they delayed for over a year before giving Mr. Moshier a liver biopsy, puting him through undue pain and suffering. Proven clinical tests displayed the presence of HCV with cirrohsis. All this proves the deliberate indifference, and malpractice and negligence of the medical staff at FCI McKean and BOP.

On May 16th of 2005, Mr. Moshier arrived at USP Lewisburg. On October 25th 2005, enter Dr, Bussanich. Dr, Bussanich did not give Mr. Moshier any treatment what-so-ever while claiment was incarcerated at USP lewisburg. On March 19th 2007, claiment was transferred to FCI Schuylkill. The record show's that all Dr. Bussanich did was order blood tests for Mr. Moshier's ALT level. The medical staff at FCI McKean didn't want to be bothered with Mr. Moshiers illness. They wanted to rid themselves of their responsibility to the health

(7)

care of Mr. Moshier. Claiments record's followed him to USP Lewisburg. It does not take any stretch of the imagination, that the medical staff at FCI McKean conversed with Dr. Bussanich, to manipulate in a chicane and devious manner to cover up Mr. Moshiers medical records to lend less credibility to his testimony, and give light more favorable to the doctor's and medical staff, at FCI McKean.

There is no mystery to this. Doctor's use concerted effort's to keep an illegal or unethical act[s] or situations from being made public. There is a great deal at risk- twelve years of medical training; recinding of his medical license permanently or its suspension. After all Mr. Moshier is just an inmate, a convicted felon, we have more to lose than he does.

After the episode where Mr. Moshier was attacked and stabbed twenty-one (21) times, and nearly died, he was transferred to FCI Schuylkill on March 19th 2007. The medical staff here at Schuylkill complain of the same reasons- Interferon/Ribavirin is very expensive, and requires a tremendous amount of time and follow-up procedures that the doctor's and medical staff do not want to do because of the complexity of the body's reaction to treatment, such as the constant monitoring of Mr. Moshier's ALT levels, and appropriate doses to combate this serious infection. From March 19th 2007, till September 30th 2007, there was no medical doctor at FCI Schuylkill, only PA's.

Within the scope of this controversy, why is it that Dr.'s Beam, Olson; and Smith rely on Dr. Bussanich's medical report? Dr. Bussanich never treated Mr. Moshier! Dr. Bussanich explicate's how proficient he is in interpretating the latin medical derivatives.

(8)

His thorough accounting of the treatment that the medical staff allegedly performed on Mr. Moshier, has been well rehearsed. Even a layman in medical terminology forms a mental picture that they are all in concert to rebutt the egregious treatment that Mr.Moshier claims in his suit. Why does Dr.'s Beam; Olson; and Smith have Dr. Bussanich speak for them? They certainly can't be using his testimony as an expert witness are they? He'a constituent, sure sends up a red flag here! Aren't Dr.'s Beam;Olson; and Smith, medical doctor's? Collectivity there should be a plethora of medical knowledge between them! Aren't they proficient in all area's of the practice of medicine?

Could it be that Dr. Bussanich has a medical degree to practice medicine in the State of Pennslyvania, and is recognized by the State of Pennslyvania's Medical Board, and Dr. Beam does not?

For whatever reasons Dr.'s Beam, Olson ,and Smith, used Dr.'s Kisloff and Dr.Bussanich, the facts remain-- Mr. Moshier was not given the proper treatment, and the proper time intervals that are required to bring his HCV under control.

## CONCLUSION

As a direct and proximate result of defendants negligence and deliberate indifference, plaintiff has suffered physical pain and mental anguish, in the past and present. Claiment's limited education limits him to physical laborious employment in his future. His abilities will be grossly impaired because of the ignorance displayed by the medical staff at FCI McKean, USP Lewisburg and FCI Schuylkill.

For these reasons claiment asks for the following: 100,000,00 for actual damages for negligence; 100,000,00 for deliberate indifference; cost of the suit; any and all other relief

this Honorable Court deems appropriate, given the circumstances.

Respectfully submitted:

Donald L. Moshier, JR.
#10924-052
FCI Schuylkill
P.O. Box 759
Minersville PA 17954

Date December 12 th , 2007

## CERTIFICATE OF SERVICE

I Hereby certify A True and Accurate copy of the foregoing
plaintiffs Rebuttle, to the UNITED STATES Motion for Summary judgment,
with  Exhibits, to be sent by regular U.S.Mail, this/2day of December,
2007, postage prepaid to the following:

RESPECTFULLY SUBMITED

DONALD L.MOSHIER JR.

\# 10924-052

F.C.I.Schuylkill

P.O.BOX 759

Minersville,PA 17954

MAGAN FARRELL, A.U.S.A.

WESTERN DISTRICT OF PENNSYLVANIA

700 grant street,suite 4000

PITTSBURG, PA 15219

SUSAN PARADISE BAXTER

CHIEF UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

17 SOUTH ROW. ROOM A280

ERIE, PA 16501

# E X H I B I T S

PAGE  02

/2004  08:46    8143681998                    LAB

## BRADFORD REGIONAL MEDICAL CENTER
### 116 Interstate Parkway
### Bradford, Pennsylvania 16701

### DEPARTMENT OF PATHOLOGY

SURGICAL PATHOLOGY REPORT

Moshier, Donald
M 43 DOB 8/18/61
MR# 226525

Dr. Horsley/Beam
4447798 FC: 11
ROOM: OP

PATHOLOGY NUMBER: S04-3048

DATE OF OPERATION: 08-24-04
Received in Pathology: 08-24-04

PRE-OP DX: Elevated LFTS
PROCEDURE: CT Guided Needle Biopsy
CLINICAL INFORMATION:

SPECIMEN/LOCATION: CT Guided Needle Biopsy of Liver

GROSS DESCRIPTION: The specimen received in formalin consists of four tan-brown, linear soft tissue fragments, varying from 0.7 to 1 cm in length and 0.1 cm in diameter.  The entire specimen is submitted.

MICROSTUDY DIAGNOSIS:
CT Guided Needle Biopsy of Liver:
    Cirrhosis of liver, micro-nodular pattern, active.  See comment.

COMMENT: Focally hepatocytes show mild to moderate micro and macrovesicular fatty degeneration with focal ballooned hepatocytes, focal areas of piecemeal necrosis. Special stains, trichrome, show increased fibrous tissue.  Special stains for Iron do not show increased stainable Iron.  The possible etiology includes among others the following: alcoholic cirrhosis, viral hepatitis with cirrhosis.  Findings should be clinically correlated.

Exhibit 5A Part 3 P.No. 000191

DATE OF REPORT: 08-26-04

Syed Ally, MD                    000191

REVIEWED BY: 9/7/04    H. BEAM, MD

# Bradford Regional Medical Center
### 116 Interstate Parkway
### Bradford, Pa 16701

## Department of Medical Records

| | | |
|---|---|---|
| **Patient:** MOSHIER,DONALD | **Medical Record #:** M000226525 | **Acct #:** V04546554 |
| **DOB:** 08/18/1961 | **Age:** 43 | **Sex:** M |
| **Admitting MD:** Graham, Nathaniel MD | **Room/Bed:** 446A-1 | **Location:** 4EAST |
| **Admit Date:** 04/18/05 | **Discharge Date:** 04/27/05 / 1347 | |

## DISCHARGE SUMMARY

**DISCHARGE DIAGNOSIS:** Severe acute cholecystitis with signs of gangrene at the gallbladder clinically.

**PROCEDURE:** Open cholecystectomy.

**HISTORY:** See HP.

**HOSPITAL COURSE:** The patient was brought to the hospital and given intravenous fluids and antibiotics in an attempt to cool down his cholecystitis. This was unsuccessful, and he required emergent operation. Because of the amount of guarding and expected amount of inflammation, it was planned as an open procedure which was carried out without complications. He recovered very well, particularly considering his comorbidities including hepatitis C with cirrhosis. He improved gradually. JP drain was left in for 5 days. Kept on Zosyn as an antibiotic. He is now eating regular food. The incision is healing well. He has been having some diarrhea in the last 24 to 48 hours. It appears to be related to his antibiotics. We will get a stool titer for C. difficile. Started him on acidophilus, and I have discussed with Dr._____ at FCI McKean. He has now been in the hospital for 8 postop days and is ready to be discharged, and he will be followed by the physicians at FCI McKean.

**PROGNOSIS:** Good in the short term for his cholecystitis. Guarded for his hepatitis.

Job#: 4560034 / 891280

Signed By: _____

Graham, Nathaniel MD

GRAHNA/PRECYSE
DDT: 04/27/05 0911
TDT: 04/27/05 2159
Report Number: 0427-0062
cc:
FCI MCKEAN
Graham, Nathaniel MD

Reviewed by D. Olson, MD
Date: 5/2/05

EXHIBIT 5A Part 4 P. No. 000274

000274
1

6.    Identify each witness who you may call to testify at trial in support of your claim in this action, including hostile witnesses, and for each witness provide the following information:

  a.    His or her full name, residence address and phone number, business address and phone number, occupation, title and, if applicable, Federal Registration number;

  b.    The subject matter of his or her testimony and the substance of all facts or opinions to which each witness is expected to testify; and

  c.    All documents upon which such witness will rely.

## ANSWER:

a. Dr.Beam. I'd expect him to be honest. He told me that his hands were tied, or he would give me the treatment (Interferin/ Ribaviron).

b. Dr. Olson. His testimony which I expect to also be honest, he just passed the buck when it came to making an important decision about my treatment. He told me I was primarily under Dr. Beam's supervision.

c. Dr. Smith told me practically the same story, that I was under the watchful attention of Dr.Beam.

        As to the facts and opinions of each of these witnesses they are expectedto testify under oath, and what they testify too, depends on what questions the examiner ask's of them! As far as documents go, that depends on what documents they have in their possession.

d. Mr.Morello, FCI Mckean counselor, whom I filed my BP-8's, I assume he wouldbe truthful,that I was not getting the treatment. He was aware I was gettingthe run-around by allthe medical staff.

*ATTACHMENT E-F



EXHIBIT B

**ATTACHMENT E-F**

e. Dr. Bussanich, cheif medical physcian at USP Lewisburg, responded with a 34 page declaration **Exhibit 2** .  I would assume that if Dr.Bussanich is honest, that he would also be truthful.

f. Dr. Graham, staff physcian at bradford Hospital. Dr. Graham told me when I was admitted, that I was a very sick man, that I would have been dead in another twenty hours. Also said after questioning me further about what medicine I was taking, that if I had been treated earlier with the proper antibiotics, the infection wouldn't be so well advanced.

James Fowers, inmate No. 20120-068, was Plaintiff's room-mate, he will testify to my illiness, and to the fact I was refused treatment, he will also testify to the fact how the staff at FCI McKean  started retaliating against me for filing on the medical staff.

Donald G. Jackman Jr., Inmate No. 06804-068, inmate at FCI McKean. He will testify to my illiness and how I was refused medical treatment.

G.R. Leacock, inmate No. 02121-052, inmate at USP Lewisburg, will will testify to the fact that Dr. Bussanich did nothing for my Hepatitis C.

Kevin Hody, inmate No. unknown, was a inmate at McKean. We were both in the Special Housing Unit SHU, when I was stricken with pain, and was refused by staff to assist me. He was present at the time I was transported to Bradford Hospital.

Kurtis Armond, inmate at FCI McKean at the interim, now released. His home address: P.O. Box 8105, Zanesville, OH 43702

Anthony Loewell, inmate No. 11015-055, inmate at FCI McKean, Contact address: 4935 Main St. Bemus point, NY 14712 PH: (716) 386-5964.

**ATTACHMENT 11-B**  Witness's continued

Richard Smith, inmate No. 10463-052, former inmate at USP Lewisburg. Contact Address: 15 Hill Street Keeseville, NY 12944;

Jimmy Craft, inmate at USP Lewisburg, will attest to my illness and lack of medical care;

Raymond Cornwell, inmate at FCI McKean, # unknown, can be located by name at the institution;

Darryl Lee Cherry, # unknown, inmate at FCI McKean.

How each expert witness will testify is anyone's guess, Plaintiff is indigent and cannot afford the luxury of private counsel or professional investigator/medical expertise. As this examiner/panel most suredly must be aware of- this is not a level playing field and most assuredly is balanced in the prison/ doctor's favor, Plaintiff is a layman at law, is at the caprice whim of prison administration, and can only tell the truth.

# American Medical Association



# Complete Medical Encyclopedia

## Medical Editors
Jerrold B. Leikin, MD
Martin S. Lipsky, MD

EXHIBIT C



Random House Reference
New York

aptoms at all.
s such as nau-
muscle and joint
ess, and a low-
e goes on, an
aundice (a yel-
d the whites of
elop. In some
are-ups of HBV
tion with hepa-
HEPATITIS D),
infectious dur-
eek incubation
between initial
s and the acute
s). Even after
sappear, some
continue to be
people become

lasts longer than
e chronic stage,
sive, life-threat-
of liver cells.
s include CIR-
isease in which
destroyed and
e), liver failure,
for developing
with infected
uids is the pri-
s B. Risk groups
have multiple
icularly homo-
travenous (IV)
needles, heath
who get tattoos
ith improperly
and those with
h as hemophil-
be passed from
her infant dur-

ATMENT
made by physi-
dical history,
use the disor-
no symptoms,
ough abnormal
ts obtained
routine blood
ute cases con-
d rest, a bal-
iding alcohol.
cted mothers
itis B immune
ours of birth.
n and lamivu-
success in
itis B. How-
related
affects.



**PREVENTING HEPATITIS B**
Health care workers are at risk of contracting hepatitis B from infected patients and from accidentally sticking themselves with a contaminated needle. To avoid getting the disease and passing it to others, doctors and other health care professionals are vaccinated regularly.

such as fever, muscle aches, and chills. Lamivudine is now available in oral form. If HBV destroys a major portion of the liver and prevents it from functioning properly, a liver transplant may be considered.

**PREVENTION**
Because a vaccine for hepatitis B exists, HBV is preventable. In the United States, immunization with the hepatitis B vaccine (see VACCINATIONS, CHILDHOOD) begins at birth. Older children who have not yet been vaccinated should receive a series of three injections when they are 11 or 12 years old. Adults with multiple sexual partners or who live in a household with a carrier of chronic HBV and those with bleeding disorders (such as hemophilia) should be immunized. Pregnant women in the United States are now routinely tested for hepatitis B. This has helped to eliminate the passage of the virus from mother to infant. To guard against HBV, doctors advise people who use IV drugs not to share needles or to have unprotected sex with infected or multiple partners. Tattoos and body piercings should take place only in sanitary establishments. Although the risk is slight, personal items (such as razors and toothbrushes) should not be shared with an infected person.

## Hepatitis C
Inflammation of the liver due to infection with the hepatitis C virus (HCV). Hepatitis C is more likely than any other type of hepatitis to lead to chronic hepatitis (meaning

that the virus persists in the blood 6 months or more after the initial infection). Nearly nine of ten people who contract hepatitis C retain evidence of it indefinitely and are carriers of the virus. Until 1992, when a screening test was developed to identify blood donors with HCV, it was possible to contract this virus through a blood transfusion. This is no longer the case. Although many people never discover exactly how they contracted the virus, hepatitis C most frequently occurs in intravenous (IV) drug users who share needles; people who get tattoos or body piercings with poorly sterilized equipment; health care workers; and those with bleeding disorders such as hemophilia. It is not common for hepatitis C to spread through sexual activity with an infected person or from an infected mother to an infant.

**SYMPTOMS AND DIAGNOSIS**
Many people with hepatitis C experience no symptoms at all. They can have the disease for many years without being aware of it. However, about one in four affected people develops acute flulike symptoms within 6 months of exposure. Possible symptoms include nausea, loss of appetite, muscle and joint pain, fatigue, weakness, and a low-grade fever. As time goes on, an enlarged liver and jaundice (a yellowing of the skin and the whites of the eyes) can develop. Dark urine, pale stools, and itching may accompany jaundice. Rashes and memory loss also develop in some chronic cases. Possible complications of chronic HCV include CIRRHOSIS (a severe liver disease in which healthy cells are destroyed and replaced by scar tissue), liver failure, and an increased risk for liver cancer.

Diagnosis of hepatitis C is made by physical examination, medical history, and blood tests. Because the disorder commonly has no symptoms, it is often detected through abnormal levels of liver enzymes obtained during the course of routine blood tests. Typically, the elevated enzymes are alanine aminotransferase (ALT) and aspartate aminotransferase (AST), which leak out of injured liver cells into the blood.

**TREATMENT AND PREVENTION**
Eating a balanced diet, avoiding alcohol, and getting plenty of rest

ing alcohol may relieve acute symptoms. However, treatment decisions regarding chronic hepatitis C are difficult, particularly for those who experience no symptoms. The course of the chronic disease varies from person to person. The majority of those chronically infected will not sustain any long-term liver damage. However, about two in ten persons develop the permanent scarring of the liver that is typical of life-threatening cirrhosis.

The only cure for chronic infection with HCV is a complicated and lengthy regimen of interferon injections and ribavarin capsules. These drugs must be taken for a year or more. **Interferon is self-injected several times each week;** in many people, it causes devastating, flulike side effects (including fever, chills, and body aches) and severe depression. Many find that they cannot tolerate the regimen. Treatment is not universally successful, and in many cases, the infection returns.

Eventually, if hepatitis C destroys a major portion of the liver and prevents it from functioning properly, a liver transplant may be required. Hepatitis C is currently the most common reason for liver transplants in the United States. Because there is no vaccine against hepatitis C, prevention is key. To guard against this virus, doctors advise people not to share IV needles and caution that tattoos and body piercings must take place only in sanitary establishments. Health care workers who have contact with blood and blood products should exercise appropriate precautions. In addition, although the risk is slight, personal items (such as razors and toothbrushes) should not be shared in the home of an infected person.

## Hepatitis D
A liver infection that occurs only in people who are already infected with the hepatitis B virus (HBV). Like HEPATITIS B, this infection is spread primarily through contact with infected blood and through sexual activity. In the United States, hepatitis D (also known as delta hepatitis), which is caused by the hepatitis D virus (HDV), is responsible for about 2 percent of all cases of acute viral hepatitis and is more c

Infecti
in two
ously
conditi
likeliho
tion is
centage
chronic
persists
longer
Howeve
develop
chronic
as sup
with ch
disease
B or C.
severe a
result in

Sympt
appetite
fatigue,
fever. W
enlarged
lowing
of the ey
in colo
Eventual
to CIRRHO
which h
and repl
increased
when sy
person w
of the vir

Diagnos
ical exam
and bloo
of bed r
avoiding
that is us
hepatitis
found h
of hepat
destroys
and prev
properly,
considere
transplan
may recu

## Hepati
Inflamma
infection
(HEV). Th
epidemic
transmitte
tract. No
occurred
disease or
ep



Head of penis (glans) — — — — — — — Testicle

Remaining foreskin
stitched to penis

Foreskin to be removed

**REMOVING THE FORESKIN**
To perform a circumcision, the doctor removes the foreskin, the skin and underlying mucous membrane that covers the head of the penis. The remaining rim of the foreskin is stitched to the skin covering the shaft of the penis, just behind the head.

hours. Oral pain medications may also be prescribed.

Complications of circumcision can include excessive bleeding and infection. In rare instances, the glans or the urinary opening may be damaged and require surgical repair.

## Cirrhosis

A chronic disease that causes degeneration of healthy, functioning liver cells that are gradually replaced by scar tissue. The scarring destroys the normal structure of the liver. As scar tissue replaces healthy tissue, the liver is less able to remove toxins from the bloodstream and carry out its normal functions. Eventually, if enough liver cells are damaged, liver failure and death result. The scarring can also cause portal hypertension (an increase in the pressure of the blood system of the liver). Portal hypertension can cause ESOPHAGEAL VARICES (the dilation of the veins of the esophagus), a potentially life-threatening condition in which the veins are prone to bleeding. Cirrhosis also increases the risk for liver cancer.

### SYMPTOMS AND CAUSES

The early stages of cirrhosis cause few symptoms. Eventual symptoms may include loss of appetite, weight loss, indigestion, weakness, and fatigue. Spidery red-lines called angiomas may appear on the face, arms, and upper trunk. In many people, there is a general loss of a sense of well-being. In the late stages of cir-

rhosis, as the tissue damage becomes severe, there are signs such as ascites (an abnormal accumulation of fluid in the abdominal cavity), bleeding in the digestive tract, and, sometimes, jaundice (the yellowing of the skin and the whites of the eyes). There may also be a loss of interest in sex, development of breasts in men, a cessation of menstrual periods in women, general swelling, irritability, confusion, impaired memory, and an inability to concentrate.

Alcoholism, fatty liver, and hepatitis C (a viral infection) are the most common causes of cirrhosis in the United States. Alcoholic cirrhosis usually occurs only in people who consume large amounts of alcohol for 5 or more consecutive years. Women are more susceptible than men to liver damage from alcohol because of their smaller size and their lack of certain enzymes that break down alcohol. Although daily heavy drink-



**LIVER DAMAGE IN CIRRHOSIS**
Scar tissue is evident on the liver of a person who was chronically dependent on alcohol.

ing is more likely to cause liver damage, even intermittent use of alcohol can harm the liver. Other causes of cirrhosis include viral infection, autoimmune disease, MALNUTRITION, parasites, drug reactions, toxic chemicals, metabolic defects, and congestive heart failure (see HEART FAILURE, CONGESTIVE). Sometimes, the cause cannot be identified.

### DIAGNOSIS AND TREATMENT

Because many liver diseases cause similar symptoms, a number of tests must be performed to make a definitive diagnosis of cirrhosis. In addition to conducting a physical examination and taking a medical history, the doctor may order tests, such as blood and urine tests, liver function tests, ultrasound scanning, X rays, and a liver biopsy. The physician must also be made aware of the person's history of alcohol consumption.

In the early stages of cirrhosis caused by alcohol, it is often possible to halt the progression of cirrhosis by completely avoiding alcohol. Alcohol consumption causes all forms of cirrhosis to worsen. As cirrhosis progresses, medications can be prescribed to treat symptoms. For example, diuretics relieve fluid retention and antacids ease abdominal discomfort. Hospitalization is required in severe cases of gastrointestinal bleeding, vomiting blood, or excessive fluid accumulation. In some cases, a transfusion is necessary.

A liver transplant may be recommended for people with advanced disease who have BILIARY CIRRHOSIS or whose disease is caused by hepatitis, fatty liver, or toxins. If cirrhosis caused by alcohol is accompanied by the deterioration of additional organs (such as the heart and brain), a liver transplant is less likely to be recommended. However, for people who permanently stop drinking and are otherwise healthy, a liver transplant is an option.

## Cisapride

A drug formerly used to treat heartburn caused by gastroesophageal reflux disease. In 2000 the manufacturer removed cisapride (Propulsid) from the US market because of potentially serious cardiac side effects. Cisapride is available only for patients who meet specific criteria.

## LABORATORY TEST

Below is a chart with normal and abnormal ranges of basic blood tests for hepatitis C. These blood tests are very important to know Always ask for copies of your lab results and keep them for future reference. Note: every lab has its own normal range.

## NORMAL AND ABNORMAL VALUES FOR LABORATORY TESTS

| | Normal Range | Abnormal Range | |
| --- | --- | --- | --- |
| **TEST** | **NORMAL** | **MODERATE** | **SEVERE** |
| **LIVER ENZYMES** | | | |
| ALT | Under 40 IU/L | 40-200 | Over 200 |
| AST | Under 40 IU/L | 40-200 | Over 200 |
| GGT | Under 60 IU/L | 60-200 | Over 200 |
| Alkaline Phosphatase | Under 112 IU/L | 112-300 | Over 300 |
| **LIVER FUNCTION TEST** | | | |
| Bilirubin | Under 1.2 mg/dl | 1.2-2.5 | Over 2.5 |
| Albumin | 3.5-4.5 g/dl | 3.0-3.5 | Under 3.0 |
| Prothrombin Time | Under 14 seconds | 14 -17 | Over 17 |
| **BLOOD COUNT** | | | |
| WBC | Over 6,000 | 3,000 - 6,000 | Under 3,000 |
| HCT | Over 40 | 35-40 | Under 35 |
| Platelets | 150,000 | 100,000 – 150,000 | Under 100,000 |

**KEY**

ALT= Alanaine Aminotransferase
AST= Aspartate Aminotransferase
GGT= Gamma Glutamyl Transferase
WBC= White Blood Count
HCT= Measure of red blood cell volume
IU= International Units
l= Liter
dl= Deciliter
mg = milligrams

EXHIBIT D (4) PAGES

## UNDERSTANDING BLOOD TESTS FOR THE LIVER

1) Liver Enzymes 2) Bilirubin 3) Albumin 4) Clotting Factors 5) Complete Blood Count

**1. Liver Enzymes:** A liver cell produces proteins, called enzymes that live within the cell or its membranes. In a way, you can think of your liver as a powerful chemical factory; it changes raw materials into the substances your body needs. Enzymes are catalysts that help a liver cell do its job of creating the specific chemical changes that give your body fuel to live. Here are the names of the enzymes you need to remember.

- ALT (SGPT) – alanine aminotransferase
- AST (SGOT) – aspartate aminotransferase
- GGT – gamma-glutamyl transferase
- Alkaline phsophatase

By measuring their level in your blood, doctors can monitor ongoing liver injury. Why? Under normal conditions, the level of these enzymes in your bloodstream is relatively low. But when liver cells are injured, destroyed, or die, the cell becomes leaky, and the enzymes escape into the blood that's circulating through the liver. When the cell is injured, liver enzyme levels in the blood rise.

**Massive liver injury is associated with marked increases in ALT; mild injury maybe associated with mild- or even- no increase in ALT. The correlation is strongest at earlier stages of hepatitis C, before the development of cirrhosis. However, once cirrhosis occurs, ALT levels may not be high; therefore, ALT is no longer a good indicator of further liver damage.**

What do the numbers mean? Blood test patterns relate somewhat to the type of liver injury. Typical hepatitis C patients show increases in ALT and AST, but little or no increase in GGT and alkaline phosphatase. Those with cirrhosis or who have an underlying disorder of the biliary tract (the ducts that drain bile from the liver into the intestine) may have modest elevations in GGT and alkaline phosphatase. In some unusual cases of hepatitis C, I have even seen a predominant elevation in GGT. <u>Patients tend to focus on their ALT and AST counts, but other tests are more important in measuring the health of your liver.</u>

**2. Bilirubin:** When red blood cells complete their life cycle and break down naturally in your body, they produce a yellow pigment that's passed to the liver and excreted into bile. Bile helps your body digest food, but the pigment, which has no digestive function, is called bilirubin. Blood levels of bilirubin tend to fluctuate in patients with hepatitis, although a prolonged persistent elevation in bilirubin usually means severe liver dysfunction and possibly cirrhosis.

Here's why. Most of the time, the body produces as many red blood cells as it breaks down, so you produce a constant amount of bilirubin. However, if your blood cells break down more rapidly (hemolysis) or your liver function becomes impaired, the bilirubin levels in your blood rise.

**PCR ASSAY** This method is often used for monitoring people on interferon therapy to see if they are clearing the virus. It is not yet known which of the newly developed PCR assays are the most sensitive or specific. Some labs claim that their assay is so sensitive that it can detect as few as 100 virus particles per milliliter of blood, Current assays are expensive (often more than $250.00) and may be cumbersome to use on a large number of samples.

**QUALITATIVE HEPATITIS C PCR** (viral load) tells whether there are any hepatitis C virus particles present in the blood.

**QUANTITATIVE HEPATITIS C PCR** (viral load) measures the amount of hepatitis C virus in the blood. Less than 1000 is undetectable and it could, conceivably, measure up to 120 million. Under 1 million is considered low. 2-5 million is considered moderate to high.

**Branched-Chain DNA Assay** Chiron Corporation produced the branched-Chain DNA method. Although the method is easier to apply to a large number of samples, it is relatively insensitive. It measures HCV-RNA levels only above 200,000 viral particles per milliliter.

**HEPATITIS** Hepatitis simply means inflammation of the liver. **HEPA** meaning the liver, and **TITIS** meaning inflammation. Many injurious agents can cause hepatitis, including alcohol, medications, drugs, toxins, or viruses

**ACUTE HEPATITIS** A hepatitis infection that lasts a short time – less than 6 months.

**CHRONIC HEPATITIS** A hepatitis infection that lasts a long time – from 6 months to the rest of your life.

**CIRRHOSIS** Cirrhosis is the process in which liver cells are damaged or killed and are replaced by scar tissue. Extensive scar tissue formation prevents the flow of blood through the liver causing more liver cell death and a loss of liver function. Cirrhosis develops in 20-30% of people with chronic HCV infection. This number increases if there is a history of alcohol and drug abuse.

**HEPATOCELLULAR CARCINOMA** Hepatocellular Carcinoma (liver cancer) usually only develops at the late stages of hepatitis C infection, usually after 25-30 years. Liver Cancer develops in 1-5 % of those infected with hepatitis C.

**LIVER FUNCTION TESTS – ALT & AST** A liver cell produces proteins, called enzymes that live within the cell or its membranes. When HCV causes inflammation of the liver these enzymes spill into the blood. By measuring their level in your blood, doctors can monitor ongoing liver injury. Liver enzymes do not determine what stage of the disease you are in or how badly damaged your liver is. The only way to determine this is by having a biopsy. About 1/3 of people with HCV have enzymes levels within normal range.

**STAGING**                                        **GRADING**



## THERAPIES FOR HEPATITIS C

**COMBINATION THERAPY**   Treatment with interferon (monotherapy) clears the virus to undetectable levels in approximately 10-20% of people infected with HCV. Interferon and Ribavirin taken in combination improves the response rate to 46% undetectable virus levels 6 months following therapy.

**PEGYLATED INTERFERON**  Pegylated interferon is a time-released interferon and is believed that by maintaining constant levels of interferon in the blood that the hepatitis C virus cannot replicate as successfully. Recent studies have reported a higher response rate.

Two forms of peginterferon have been FDA approved for treatment of hepatitis C. Peginterferon alfa-2a (Pegasys: Hoffman La Roche: Nutley, NJ) and peginterferon alfa-2b (Pegintron: Schering-Plough Corporation, Kenilworth, NJ). These two products are roughly equivalent in efficacy and safety, but have different dosing regimens. Peginterferon alfa-2a is given subcutaneously in a fixed dose of 180 micrograms (mcg) per week. Peginterferon alfa-2b is given subcutaneously weekly in a weight-based dose of 1.5 mcg per kilogram per week (thus in the range of 75 to 150 mcg per week). Ribavirin is an oral medication, given twice a day in 200-mg capsules for a total daily dose based upon body weight. The standard dose of ribavirin is 1,000 mg for patients who weigh less than 75 kilograms (165 pounds) and 1,200 mg for those who weigh more than 75 kilograms. In certain situations, an 800-mg dose (400 mg twice daily) is recommended (see below).

Combination therapy leads to rapid improvements in serum ALT levels and disappearance of detectable HCV RNA in up to 70 percent of patients. However, long-term improvement in hepatitis C occurs only if HCV RNA disappears during therapy and

EXHIBIT E Dr. KISLOFF

# EXHIBIT 3

176 Thornberry Drive
Pittsburgh, PA 15235-5061
July 12, 2007

Megan E. Farrell
Assistant U.S. Attorney
Western District of Pennsylvania
U.S. Post Office & Courthouse
700 Grant Street
Suite 400
Pittsburgh, PA  15219

                                Re: Donald L. Moshier, Jr. v. United States, et al.
                                Civil Action No. 05-180E

Dear Ms. Farrell:

       I have reviewed the materials concerning the above-captioned case as sent with your covering letter of June 11, 2007. Specifically these items consisted of the medical records of Donald L. Mosier, Jr. dated 9/2/03-5/26/06 and the summary of these medical records as contained in the Declaration of A.Bussanich, M.D., Chief Medical Officer, United States Penitentiary, Lewisburg, PA dated 7/24/06. Before offering an opinion as to the quality of medical care rendered to Mr. Moshier, I would briefly like to review the details of his medical problem and the therapy provided.

       Mr. Moshier informed the medical staff (Dr. Herbert Beam, M.D.) at the McKean County PA federal prison of his history of high risk behavior and the possibility that he could have hepatitis C on 9/2/03. Mr. Moshier requested testing for this possibility. Screening for the presence of the antibody to the hepatitis C virus (anti-HCV) was reported as positive on 9/16/03. On 10/10/03 Mr. Moshier's serum ALT level was reported as 115 with the upper limit of normal (ULN) < 40. Subsequent relevant testing included finding the presence of prior exposure and immunity to the hepatitis B virus (HBV) -11/26/03, ALT levels of 115 (2/12/04) and 129 (5/12/04) with the ULN on these occasions <66, determining the viral genotype to be 3e (7/19/04) and a liver biopsy performed 8/24/04 which demonstrated cirrhosis of the liver in a micronodular pattern with active areas of piecemeal necrosis (Bradford Regional Medical Center, pathology #: S04-3048). Psychological clearance for the administration of Interferon (INF) was obtained on 9/22/04 and treatment with the pegylated form of INF (PEG-INF) plus ribavirin was initiated on 10/28/04.

       Mr. Moshier's treatment extended to 4/14/05 (approximately 24 weeks) during which time he received a total of 25 doses of PEG-INF (11 at full strength) as well as daily ribavirin . The doses of these medications were modified during the course of this therapy to account for changes in bone marrow function as monitored by the medical staff.

       The management of Mr. Moshier's chronic hepatitis C included:
                          (1) The appropriate documentation of the chronicity of the active
                               infection with demonstrated elevations of the liver inflammation

marker ALT to greater than twice the ULN over a 6 month period (10/10/03 & 5/12/04 with Mr. Moshier having missed a Chronic Care Clinic visit on 4/21/04). This monitoring over time is in accordance with all current recommendations as to the treatment of chronic hepatitis C in order to document the chronic nature of the active and ongoing liver necrosis as well as to provide a basis for treatment prognosis as medication for the therapy of chronic hepatitis C is both less likely to be needed or succeed in those patients with ALT levels < twice the ULN.

(2) The typing of the hepatitis virus to provide the correct duration of therapy, which in this instance is 24 weeks.

(3) The performance of a liver biopsy to accurately gauge the extent of disease prior to the onset of therapy and, in Mr. Moshier's case, to carefully monitor him for treatment-induced hepatic decompensation. This is an important consideration when initiating anti-viral therapy in an individual with already established advanced (cirrhotic) liver disease.

(4) The careful monitoring of bone marrow functioning during the course of therapy.

(5) The exclusion of relevant concomitant disease prior to initiating treatment which would profoundly influence the modality of therapy by checking for hepatitis B and HIV (performed 4/16/03, negative HIV-Ab).

(6) The modification of medication dosage schedules consistent with bone marrow function assessments by appropriately timed monitoring of total white cell, neutrophile and platelet counts as well as hemoglobin and hematocrit testing.

As regards the advanced stage of liver disease noted on the 8/24/04 biopsy, this was the product of decades of liver disease rather than the almost twelve month time frame from initial request for evaluation for possible hepatitis C virus infection (9/2/03) to the time of liver biopsy (8/24/04). This conclusion is further supported by the 6/6-8/99 Cayuga Medical Center at Ithaca medical records which establishes a diagnosis of cirrhosis in Mr. Moshier, Jr. prior to the time of incarceration in the Lewisburg, PA Penitentiary. In the non-immunocompromised, non-multiply infected individual with actively ongoing hepatitis C infection, the process leading to cirrhosis involves decades rather than months.

In summary it is my opinion, to a reasonable degree of medical certainty, that Mr. Moshier's chronic hepatitis C was diagnosed and treated in an entirely appropriate manner consistent with the medical standards of care for this disease.

Sincerely yours,

Barry Kisloff, M.D., FACP

EXHIBIT F SCHUYLKILL MED.

**U.S. MEDICAL CENTERS FOR FEDERAL PRISONERS**
**Laboratory, 1900 W. Sunshine**
**SPRINGFIELD, MISSOURI  65808**
**(417)  862-7041**

```
***   SENSITIVE BUT UNCLASSIFIED   ***
                FINAL REPORT
```

Register Number : 10924-052                        Age              : 45yr
Name            : MOSHIER  JR, DONALD               Sex              : M
Location        : FCI SCHUYLKILL (SCH)              Room             :
Admit. Physician: HENDERSHOT                        Accession Number : 2188
Order. Physician: HENDERSHOT
Collected       : 08/02/07 @  10:00 by:  RE

| Test | Result | Flag | Reference Range/Units | Tech |
|------|--------|------|----------------------|------|
| LIPID PROFILE | | | | |
| BASIC METABOLIC | | | | |
| Liver Profile | | | | |
| Glucose | 160 | HI | 70 - 110 mg/dL | RS CK |
| Urea Nitrogen | 23 | HI | 7 - 22 mg/dL | RS CK |
| Creatinine | 1.2 | | 0.6 - 1.6 mg/dL | RS CK |
| SodiumI | 142 | | 137 - 148 mmol/L | RS CK |
| Potassium | 3.0 | LO | 3.5 - 5.0 mmol/L | RS CK |
| Chloridel | 100 | | 99 - 114 mmol/L | RS CK |
| Calcium1 | 9.1 | | 8.5 - 10.9 mg/dL | RS CK |
| Total Protein | 8.2 | | 6.0 - 8.2 g/dL | RS CK |
| Albumin | 4.4 | | 3.6 - 5.1 g/dL | RS CK |
| Alkaline Phos. | 73 | | 41 - 133 U/L | RS CK |
| AST(SGOT) | 187 | HI | 11 - 55 U/L | RS CK |
| ALT1(SGPT) | 237 | HI | 11 - 66 U/L | RS CK |
| LDH | 798 | HI | 354 - 705 U/L | RS CK |
| Gamma GT1 | 64 | | 8 - 78 U/L | RS CK |
| Total Bilirubin1 | 0.9 | | 0.2 - 1.3 mg/dL | RS CK |
| Bilirubin Unconj | 0.9 | | 0.0 - 1.1 mg/dL | RS CK |
| Bilirubin Conjug | 0.0 | | 0.0 - 0.3 mg/dl | RS CK |
| Cholesterol | 123 | | 50 - 200 mg/dL | RS CK |
| Triglyceride | 186 | | 10 - 150 mg/dL | RS CK |
| Globulin | 3.8 | HI | 2.0 - 3.7 g/dL | RS CK |
| A/G Ratio | 1.16 | | 1.00 - 2.30 | RS CK |
| Bun/Creat Ratio | 18.5 | | 0 - 30.0 | RS CK |
| dHDL | 22 | | 40 - 60 mg/dL | RS CK |
| LDLC | 64 | | 0 - 130 mg/dL | HS CK |
| Chol/dHDL Ratio | 6.0 | HI | 0.0 - 4.0 | RS CK |
| TSH | 1.280 | | 0.465 - 4.680 uIU/mL | GK CK |
| AlphaFetoprotein | 4.2 | | 0.8 - 7.5 ng/mL | GK CK |
| CBC | | | | |
| White Blood Cell | 5.8 | | 4.3 - 11.1 10^3/uL | CO JE |
| Red Blood Cells | 5.67 | | 4.46 - 5.78 10^6/uL | CO JE |
| Hemoglobin | 17.5 | | 13.6 - 17.6 g/dL | CO JE |
| Hematocrit | 49.7 | | 40.2 - 51.4 % | CO JE |

Legend
LO=Low  AL=Alarm Low  HI=High  AH=Alarm High  AB=Abnormal
GL=Less than Clinically Reportable Range
GH=Greater than Clinically Reportable Range

Location:   ☑ FCI     ☐ FPC
SCHUYLKILL HEALTH SERVICES

Name            : MOSHIER  JR, DONALD          Location : SCH
Register Number : 10924-052                    Page     : 1 of 2
Printed         : 08/03/2007 @ 13:16

CAYUGA MEDICAL CENTER AT ITHACA
101 DATES DRIVE, ITHACA NY 14850

OPERATIVE NOTE

ACCT
MR #(

MOSHIER.DONALD L          Age:          416-02          06/06/99
DOB:

the recovery room.

Important as a final diagnosis as well, is the patient has liver cirrhosis
changes on the liver.

Hsjob: 982703
T: 16382

GUILLERMO FERRER  MD.
DICT. 19990606 1116          TR. 19990606 1313          HS