IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DONALD L. MOSHIER, JR., )<br>Plaintiff ) <br> ) | <br> <br>C.A. No. 05-180 Erie |
| v. ) <br> ) | <br>District Judge McLaughlin |
| UNITED STATES OF AMERICA, ) <br>Defendant. ) | Magistrate Judge Baxter |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.    RECOMMENDATION**

It is respectfully recommended that Defendant's motion for summary judgment [Document # 51] be granted.

**II.    REPORT**

**A.    Procedural History**

On June 10, 2005, Plaintiff Donald L. Moshier, Jr., an inmate formerly incarcerated at the Federal Correctional Institution at McKean, Pennsylvania ("FCI-McKean"), filed this *pro se* civil rights action pursuant to Bivens v. Six Unnamed Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), and the Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 2671, et seq.[1]  Originally named as Defendants were: United States of America ("United States"); John J. LaManna, former Warden at FCI McKean ("LaManna"); Herbert Beam, M.D., a physician at FCI-McKean ("Beam"); Dennis Olson, M.D., Clinical Director at FCI-McKean ("Olson"); Rodney Smith, Health Services Administrator at FCI-McKean ("Smith"); and James Sherman, Warden at FCI-McKean ("Sherman").

Plaintiff alleged that his rights under the eighth amendment to the United States

---

[1] On June 29, 2006, Plaintiff subsequently filed an Amended Complaint, which clarified Plaintiff's claims in this matter. [Document # 18].

Constitution were violated as a result of the deliberate indifference of Defendants Beam, Smith, Olson, LaManna, and Sherman to his serious medical needs. (Amended Complaint at ¶ 38). Plaintiff also alleged that Defendants Beam, Smith, Olson and United States were negligent in their treatment of his various medical conditions, including hepatitis C, gallbladder problems, and a growth on the side of his stomach. (Amended Complaint at ¶ 37). As relief for these claims, Plaintiff has sought monetary damages.

On September 21, 2006, all of the originally named Defendants filed a partial motion to dismiss, or in the alternative, partial motion for summary judgment [Document # 24], which was ultimately granted by Order of District Judge Sean J. McLaughlin, dated June 11, 2007 [Document # 43]. As a result of this Order, Plaintiff's <u>Bivens</u> and FTCA claims against the individual Defendants were dismissed, leaving only an FTCA claim against Defendant United States alleging negligent treatment of Plaintiff's hepatitis C condition while he was incarcerated at FCI-McKean.[2]

Defendant United States has now filed a motion for summary judgment [Document # 51], arguing that Plaintiff has failed to state a claim of medical negligence, as a matter of law. Plaintiff has since filed a "rebuttal" to Defendant's motion [Document # 59], and Defendant has filed a reply brief. [Document # 63]. This matter is now ripe for consideration.

**B.     Factual History**

Plaintiff is a federal inmate presently incarcerated at the Federal Correctional Institution at Schuylkill in Minersville, Pennsylvania ("FCI-Schuylkill"). On April 26, 2002, Plaintiff was sentenced by the United States District Court for the Northern District of New York to serve 120 months of imprisonment, followed by five (5) years of supervised release, for Conspiracy to Manufacture, Distribute and Possess with Intent to Distribute Methamphetamine, in violation of

---

[2] Plaintiff had also asserted FTCA claims against Defendant United States alleging negligent treatment of his gallbladder condition and a growth on the side of his stomach. These claims were also dismissed by Judge McLaughlin in his Order of June 11, 2007.

18 U.S.C. § 846. (Document # 25, Exhibit 1a at p. 2). Subsequently, on April 8, 2003, Plaintiff was sentenced by the United States District Court for the Western District of Pennsylvania to serve a consecutive term of 24 months of imprisonment, for Mailing Threatening Communications in Prison, in violation of 18 U.S.C. § 876 and 2. (Id. at pp. 2-3). Plaintiff was designated to FCI-McKean on June 6, 2002, where he remained incarcerated until he was transferred to the United States Penitentiary at Lewisburg, Pennsylvania ("USP Lewisburg") on June 26, 2005. (Id. at p. 1).[3] Assuming he receives all Good Conduct Time available, Plaintiff's projected release date is January 25, 2012. (Id. at p. 4).

In August of 2003, Plaintiff began to experience fatigue, nausea, headaches, and pain in his right side and stomach. (Amended Complaint at ¶ 10). On September 2, 2003, Plaintiff requested a hepatitis test due to his history of intravenous drug use, cocaine use, and unprotected sexual contact. (See Declaration of A. Bussanich, M.D., Chief Medical Officer at USP Lewisburg ("Bussanich Declaration"), attached as Exhibit 5 to Document # 53, at ¶ 2a).[4] In response to Plaintiff's request, a hepatitis C profile was conducted on September 4, 2003, the results of which indicated that Plaintiff had tested positive for hepatitis C. (Id. at ¶ 2b). As a result, Plaintiff was placed on the chronic care clinic list. (Id. at ¶ 2c).

On September 28, 2003, Plaintiff issued separate inmate requests to Rodney Smith, FCI-McKean's Health Services Administrator ("Smith"), and Staff Physician Herbert Beam, M.D. ("Dr. Beam"), requesting Interferon/Ribavirin treatment and regular blood monitoring. Both Smith and Dr. Beam responded to Plaintiff's requests by advising him that he would be seen by Dr. Beam on October 16, 2003, to discuss treatment. (Id. at ¶¶ 2f-g). Nevertheless, on October

---

[3] Plaintiff was subsequently transferred to FCI-Schuylkill on or about March 21, 2007. (See Document # 35, Notice of Change of Address).

[4] Dr. Bussanich's Declaration contains a detailed summary of all medical treatment Plaintiff received at both FCI-McKean and USP Lewisburg. However, since the only claim remaining in this case relates to Defendant's treatment of Plaintiff's hepatitis C condition, all other treatment Plaintiff received for various other medical conditions will be disregarded.

3

2, 2003, Plaintiff submitted an informal resolution form to his Correctional Counselor, requesting treatment for his hepatitis C, a liver biopsy, and a vaccination for hepatitis A. (Id. at ¶ 2i). On the same date, Plaintiff also sent an inmate request to Dr. Beam requesting vaccination for hepatitis A. (Id. at ¶ 2j). In response to both requests, Plaintiff was informed that Dr. Beam would see him to discuss his concerns. (Id. at ¶¶ 2j-k).

On October 10, 2003, blood was collected from Plaintiff for a Hepatic Function Panel (a liver function test), the results of which were received on October 21, 2003, and showed an elevated ALT level of 115 (reference range 0-40).[5] (Id at ¶ 2m). In written requests dated October 15, 2003, Plaintiff requested a genotype test, a hepatitis A vaccine, a viral load test, and a liver biopsy. (Id. at ¶¶ 2n, 2p, 2q, and 2r). In responses dated October 16, 2003, Dr. Beam indicated that genotype and viral load tests would be ordered, and a hepatitis A immunization and liver biopsy would be provided only if needed. (Id.). Also on October 16, 2003, Plaintiff was seen in FCI-McKean's Chronic Care Clinic, at which time Plaintiff informed Dr. Beam that he probably had hepatitis C since he was 20 years of age (he was 42 years old at the time). (Id. at ¶ 2t). After an examination, Dr. Beam ordered hepatitis C blood tests and hepatitis A and B serology tests, and issued a psychology referral. (Id.).

On October 27, 2003, Plaintiff submitted a Request for Administrative Remedy with Warden LaManna, requesting a liver biopsy and hepatitis C treatment. In a response dated November 14, 2003, LaManna advised Plaintiff that he would be treated in accordance with BOP policy. (Id. at ¶ 2v). On November 17, 2003, the hepatitis C blood tests and hepatitis A and B serology tests were conducted. (Id. at ¶ 2y). The results of these tests were reviewed on November 26, 2003, and indicated that Plaintiff had tested positive for the hepatitis B surface and core antibodies, but tested negative for the IgM antibody to the hepatitis A antigen. (Id.).

On November 18, 2003, Plaintiff submitted a written request to medical staff requesting

---

[5] ALT is a liver enzyme that is tested to determine if a patient has liver damage. (See National Institutes of Health ("NIH") Consensus Conference Statement, *Management of Hepatitis C*: *2002* at 9 (attached as Exhibit 1e to Document # 25, Defendants' Brief)).

a liver biopsy and viral load test. In a written response that same day, Dr. Beam reassured Plaintiff that he would receive treatment when needed. (Id. at ¶ 2z). On December 10, 2003, Plaintiff sent another written request to Dr. Beam requesting a liver biopsy. In a written response, Dr. Beam advised Plaintiff that BOP guidelines suggested monitoring ALT levels to see if they remained elevated, in which case a liver biopsy would be appropriate, and that Plaintiff was in the monitoring stage. (Id. at ¶ 2ee). On December 22, 2003, Defendant Beam ordered a hepatitis A vaccine for Plaintiff, which was administered on January 23, 2004. (Id. at ¶ 2kk).

On February 11, 2004, Plaintiff submitted an inmate request to Dr. Beam requesting a viral load test and liver biopsy. In a written response, Dr. Beam reiterated that, if Plaintiff's ALT levels remained high over a period of time, a viral load test and liver biopsy would be the next step. (Id. at ¶ 2ll). On February 12, 2004, a blood sample was collected from Plaintiff for a liver profile test. The results of the test were received on February 18, 2004, indicating that Plaintiff's ALT level was still elevated at 115 (reference range 11-66). (Id. at ¶ 2mm).

On May 12, 2004, another blood sample was collected from Plaintiff for a lipid test and a liver profile. The results of the tests were received on February 17, 2004, and indicated, *inter alia*, that Plaintiff's ALT level was 129 (reference range 11-66). (Id. at ¶ 2qq). As a result, on May 21, 2004, Dr. Beam forwarded a liver biopsy referral to the Utilization Review Committee ("URC"), and ordered a hepatitis C battery and a psychological evaluation. (Id. at ¶ 2rr). On July 15, 2004, the URC approved Plaintiff for a liver biopsy. (Id. at ¶ 2ss).

On July 19, 2004, a complete metabolic test was conducted, and blood samples were collected for an HCV genotyping test, a Ferritin test, and an HCV Quantasure Plus (viral load) test. The results of these tests indicated, *inter alia*, that Plaintiff's ALT level was 130 (reference range 11-66), Plaintiff's HCV was of the Genotype 3e, Plaintiff's Ferritin was 180 mg/mL, and Plaintiff's HCV level was 7,270,000 UI/mL. (Id. at ¶¶ 2tt-2ww).

On August 24, 2004, a liver biopsy was performed on Plaintiff at the Bradford Regional Medical Center. Before the examination, a CT of Plaintiff's entire abdomen was performed, which revealed that the size of Plaintiff's liver was in the upper limits of normal. After the CT

5

was conducted, a CT guided needle biopsy of Plaintiff's liver was performed, which revealed cirrhosis of the liver, micro-nodular pattern, active. (Id. at ¶ 2ccc).  On September 8, 2004, Dr. Beam informed Plaintiff that the liver biopsy revealed cirrhosis, and he discussed with Plaintiff the risks, psychological effects, and bone marrow suppression associated with Interferon treatment.  After discussion, Plaintiff indicated that he wanted Interferon treatment, and Dr. Beam agreed that the treatment was "a good idea." (Id. at ¶ 2ggg).  On September 22, 2004, Plaintiff was cleared by the Chief Psychologist to receive Interferon and Ribavirin. (Id. at ¶ 2hhh).

On October 7, 2004, Dr. Beam made an administrative notation indicating that he was approved to initiate Interferon and Ribavirin treatment on Plaintiff, which was scheduled to begin during the week of October 25, 2004. (Id. at ¶ 2kkk).  On October 28, 2004, Plaintiff received his first dosage of Interferon/Ribavirin, with no apparent distress, and was advised to return to the clinic in one week for his next dose. (Id. at ¶ 2nnn).  On November 4, 2004, Plaintiff self-administered his second Interferon injection, under supervision, and was instructed to return in one week for his next dose. (Id. at ¶ 2qqq).

On November 9, 2004, a liver profile was conducted, indicating that Plaintiff's ALT level was 160 (reference range 11-66). (Id. at ¶ 2sss).  On November 11, 2004, Plaintiff self-administered his third dose of Interferon under direct supervision. (Id. at ¶ 2uuu).  A liver profile conducted on November 17, 2004, revealed an ALT level of 144 (reference range 11-66). (Id. at ¶ 2www).  On November 18, 2004, Plaintiff received his fourth dose of Interferon. (Id. at ¶ 2xxx).  A liver profile conducted on November 23, 2004, indicated that Plaintiff's ALT level was 141 (reference range 11-66). (Id. at ¶ 2zzz).

On November 24, 2004, Dr. Beam cut Plaintiff's dosages of Interferon and Ribavirin in half, and Plaintiff received his reduced dose the next day. (Id. at ¶¶ 2aaaa and 2bbbb).  On November 30, 2004, a liver profile was conducted, which revealed an ALT level of 148 (reference range 11-66). (Id. at ¶ 2eeee).  On December 2, 2004, Plaintiff received a full dose of Interferon, which he tolerated well. (Id. at ¶ 2ffff).  Plaintiff was seen by Dr.. Beam the next day, at which time Plaintiff reported that he was "doing okay."  (Id. at ¶ 2gggg).

On December 7, 2004, a liver profile was conducted, which indicated that Plaintiff's ALT level was 158 (reference range 11-66). (Id. at ¶ 2iiii). Two days later, Plaintiff received a one-half dose of Interferon. (Id. at ¶ 2jjjj). Thereafter, weekly liver profiles were conducted from December 14, 2004, through April 5, 2005, which revealed ALT levels ranging from a high of 208 on December 21, 2004, to a low of 91 on March 29, 2005. (Id. at ¶¶ 2llll, 2pppp, 2ssss, 2uuuu, 2yyyy, 2aaaaa, 2jjjjj, 2mmmmm, 2ooooo, 2rrrrr, 2ttttt, 2vvvvv, 2yyyyy, and 2bbbbbb). During this time period, Plaintiff received his weekly dose of Interferon within one to two days after each profile. (Id. at ¶¶ 2mmmm, 2qqqq, 2tttt, 2wwww, 2zzzz, 2bbbbb, 2ddddd, 2fffff, 2hhhhh, 2kkkkk, 2nnnnn, 2qqqqq, 2sssss, 2uuuuu, 2wwwww, 2zzzzz, and 2cccccc). In all, Plaintiff received twenty-five (25) weekly doses of Interferon, eleven of which were full doses. (Id. at ¶ 2ffffff). On April 20, 2005, Dr. Beam entered a notation in Plaintiff's medical record indicating that Interferon and Ribavirin would be discontinued, due to recent gallbladder surgery. (Id. at ¶ 2uuuuuu).

On May 19, 2005 and May 25, 2005, Plaintiff submitted separate written requests to Dr. Beam for blood work for his hepatitis C status. In a written response to each request, Dr. Beam indicated that the blood tests had been ordered. Dr. Beam explained further that the treatment for hepatitis C was suspended 1-3 months to make sure Plaintiff was healed from his gallbladder surgery. (Id. at ¶¶ 2ggggggg-2hhhhhhh).

On May 31, 2005, a liver profile was conducted, the results of which indicated that Plaintiff's ALT level was 73 (reference range 11-66). (Id. at ¶ 2jjjjjjj). On June 16, 2005, Plaintiff was transferred to USP Lewisburg. (Id. at 2mmmmmmm).[6]

### C. Standards of Review
#### 1. Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted

---

[6] Since Plaintiff's claims pertain solely to his medical treatment at FCI-McKean, there is no need to recite his medical history after his transfer to USP Lewisburg.

7

if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact. See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under

applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### 2. *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Haines v. Kerner, 404 U.S. 519, 520-521(1972) quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should be done so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same).

### D. Discussion

The FTCA allows a private individual to file suit against the United States for torts

9

committed by its employees acting within the scope of their employment. See Bialowas v. United States, 443 F.2d 1047 (3d Cir. 1971). The liability of the United States is determined by the law of the state where the allegedly tortious conduct occurred. United States v. Muniz, 374 U.S. 150, 152 (1963)(citing 28 U.S.C. § 1364(b)). Because the conduct in this case is alleged to have occurred at FCI-McKean, which is located in Bradford, Pennsylvania, the United States' liability in this case must be determined by the laws of Pennsylvania governing medical negligence claims. See, e.g., Wooding v. United States, 2007 WL 951494 at * 3, n. 6 (W.D.Pa. Mar. 27, 2007).

Under Pennsylvania law, to establish a *prima facie* case of medical malpractice, the burden falls on the plaintiff to produce evidence establishing each of the following elements: "(1) a duty or obligation recognized by law, (2) a breach of that duty by defendants, (3) a causal connection between the defendants' breach of that duty and the resulting injury, and (4) actual loss or damage suffered by complainant." Hill v. LaManna, 2007 WL 777007 at * 12 (W.D.Pa. Mar. 12, 2007)(citation omitted). All of the elements must be met in order for a plaintiff to recover in tort.

As an initial matter, "where there is no duty of care, there can be no negligence." Maxwell v. Keas, 639 A.2d 1215, 1217 (Pa.Super.1994). "Whether a defendant owes a duty of care to a plaintiff is a question of law" (Kleinknecht v. Gettysburg College, 989 F.2d 1360, 1366 (3d Cir.1993)) and revolves around the relationship between the two parties. In this case, Congress has established a statutory duty of care to be applied when federal prisoners sue the United States for negligence. Title 18 U.S.C. § 4042 requires "the exercise of ordinary diligence" to keep inmates safe from harm. Id. Federal courts have construed this statute to include the duty to provide adequate medical care to all federal inmates. Accordingly, the first prong of Plaintiff's *prima facie* case is satisfied.

However, assuming, *arguendo,* that Plaintiff can meet his burden of demonstrating a breach of Defendant's duty to provide adequate medical care, it is clear that he cannot meet his burden of demonstrating a causal connection between the alleged beach and the injury he claims to have suffered as a result of such breach. Specifically, in his rebuttal to Defendant's motion

10

for summary judgment, Plaintiff makes clear he is claiming that "because of the laxity of the doctor[s] at FCI McKean the Hepatitis C virus continued unabeted [sic] until he became very ill. His condition termed at the beginning as a mild case of cirrhosis, permeated through his system infecting his gallbladder until it became gangerous [sic]." (Document # 59 at p. 5). Thus, Plaintiff attempts to make a causal connection between Defendant's alleged failure to provide adequate medical care for his hepatitis C condition, and the ultimate removal of his gallbladder due to acute inflammation and the onset of gangrene. However, Plaintiff fails to present any expert medical opinion or testimony to validate such a causal connection. This failure, alone, is fatal to Plaintiff's claim. See Wooding v. United States, 2007 WL 951494 at *5 (W.D.Pa. Mar. 27, 2007)(granting summary judgment in favor of the United States based upon the plaintiff's failure to supply expert testimony demonstrating that his claimed injuries were caused by the government physician's alleged failure "to employ the requisite skill and knowledge"); Gindraw v. Dendler, 967 F.Supp. 833, 837 (E.D.Pa. 1997), quoting Mitzelfelt v. Kamrin, 584 A.2d 888, 892 (Pa. 1990)(holding that, because the actions of a physician encompass matters not within the ordinary knowledge and experience of a layperson, Pennsylvania law requires that allegations of medical malpractice may not be proven without the testimony of "an expert witness who will testify, to a reasonable degree of medical certainty, that the act of a physician deviated from good and acceptable medical standards, and that such deviation was the proximate cause of the harm suffered").

      Moreover, Defendant has provided an expert report from Barry Kisloff, M.D., F.A.C.P., a Board-certified gastroenterologist, who opines, unequivocally, that "[t]here is no causal connection between hepatitis C, its treatment and the development of cholecystitis [inflammation of the gallbladder] in any of its forms." (Document # 63, Exhibit 1 at ¶ 5). Thus, Plaintiff is unable to demonstrate the requisite causal connection between Defendant's alleged breach of its duty to provide adequate medical treatment and the injury Plaintiff claims to have suffered as a result of such breach. Because Plaintiff cannot meet his burden of proving this third element required to establish a *prima facie* case of medical negligence under Pennsylvania law, his claim must fail. Accordingly, summary judgment should be granted in favor of

Defendant.

### III.     CONCLUSION

      For the foregoing reasons, it is respectfully recommended that Defendant's motion for summary judgment [Document # 51] be granted.

      In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C)), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed ten (10) days from the date of service to file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights. See e.g., Nara v. Frank, 488 F.3d 187 (3d Cir. 2007).

      /s/ Susan Paradise Baxter
      SUSAN PARADISE BAXTER
      Chief U.S. Magistrate Judge

Dated:  April 9, 2008

cc:    The Honorable Sean J. McLaughlin
       United States District Judge